Anthony J. Oncidi (State Bar No. 118135)
aoncidi@proskauer.com
Jeremy M. Mittman (State Bar No. 248834)
jmittman@proskauer.com
Pietro A. Deserio (State Bar No. 309230)
pdeserio@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East
32nd Floor
Los Angeles, California 90067-3206
Telephone:    (310) 557-2900
Facsimile:     (310) 557-2193

Attorneys for Plaintiff
INSIGHT GLOBAL, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSIGHT GLOBAL, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> BEACON HILL STAFFING GROUP, LLC, a Massachusetts limited liability company <br><br> Defendant. | Case No. 3:17-cv-00309 <br><br> **INSIGHT GLOBAL, LLC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** <br><br> **(1) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** <br><br> **(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br><br> **(3) INDUCING BREACH OF CONTRACT;** <br><br> **(4) VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200; AND** <br><br> **(5) TRADE SECRET MISAPPROPRIATION.** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff INSIGHT GLOBAL, LLC ("Insight Global" or "Plaintiff"), by and through its attorneys, alleges the following against Defendant BEACON HILL STAFFING GROUP, LLC ("Beacon Hill" or "Defendant") on information and belief formed after reasonable inquiry under the circumstances:

## NATURE OF THE ACTION

1.      This case is about a lawless and ongoing raid that Beacon Hill and its co-conspirators have launched against Insight Global in a deliberate attempt to steal Insight Global's employees, clients, and confidential business information. Beacon Hill has acted in concert with one or more former Insight Global employees, including John Barker and Bryan Verduzco, in soliciting and encouraging a number of Insight Global employees to abruptly terminate their contractual relationships with Insight Global and to intentionally and deliberately interfere with Insight Global's existing and prospective economic relationships with its clients.  In the process, Beacon Hill and its co-conspirators have tortiously inflicted economic damage upon Insight Global.

2.      John Barker was subject to an express written agreement that he had entered into with Insight Global as a condition of his employment. As an express condition of employment with Insight Global, Barker was required to sign and agreed to be bound by the terms and conditions of a written agreement that provided, among other terms and conditions, that Barker could not, for a period of one year after the voluntary or involuntary termination of his employment, directly or indirectly, or in concert with others, solicit or encourage any employee of Insight Global to resign from or terminate employment with Insight Global (hereinafter the "Employment Agreement").

3.      Barker was terminated by Insight Global for cause on or about October 26, 2016. Insight Global is informed and believes and thereon alleges that following his termination, Barker was hired by and began working for Beacon Hill, one of Insight Global's competitors, where he launched a campaign of retaliation against his former employer. Insight Global is further informed and believes and on that basis alleges that Beacon Hill and Barker, acting in concert with one another and with full awareness of the indisputable illegality of their conduct, worked

clandestinely with each other to induce at least three other Insight Global employees—John McArthur, Connor Cronin, and Bryan Verduzco—to abruptly terminate their employment with Insight Global and commence employment with Beacon Hill. Insight Global therefore contends that Beacon Hill has engaged in wrongful conduct and has tortiously inflicted economic damage upon Insight Global.

## THE PARTIES

4.     Insight Global is a limited liability company organized under the laws of the State of Delaware with its headquarters and principal place of business in DeKalb County, Georgia located at 4170 Ashford Dunwoody Road, Suite 250, Atlanta, Georgia 30319.  Members of Insight Global are citizens of the states of Delaware and Georgia for purposes of diversity jurisdiction.

5.     Insight Global is informed and believes and on that basis alleges that Beacon Hill is a Massachusetts Limited Liability Company with a principal place of business at 153 Bowdoin Street, Boston, Massachusetts, 02108.  Insight Global is informed and believes and thereon alleges that Beacon Hill's members are citizens of Massachusetts for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. §§ 1331 and 1332(a).  Insight Global has asserted a federal claim against Beacon Hill under the Defend Trade Secrets Act.  Moreover, as described in paragraphs 4 and 5 above, there is complete diversity of citizenship between Insight Global and Beacon Hill, and the amount in controversy in this case exceeds the sum or value of $75,000.00, exclusive of interests and costs.

7.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to the claims alleged herein occurred in this district.

## FACTUAL BACKGROUND

8.     Plaintiff Insight Global is an international staffing services company with a particular focus in the information technology ("IT"), accounting and finance sectors.  With over 40 offices across the United States and in Canada, Insight Global is a leading provider of supplemental staffing services for IT, accounting, and finance professionals.  Insight Global is

consistently ranked as one of the fastest-growing staffing companies in the United States.  Insight Global regularly provides staffing services to clients throughout the country, including in the San Francisco metropolitan area.

9.     Insight Global's success as a business is based in substantial part upon its strong customer relationships and goodwill.  These relationships and goodwill have been developed through Insight Global's substantial investment in identifying and cultivating personal relationships with the human resources and management personnel (collectively, the "hiring managers") of Insight Global's customers. The hiring managers are responsible for hiring IT, accounting, and finance temporary and permanent staff and employees and determine which vendors, such as Insight Global, may provide these staffing services to the customers.

10.     Insight Global's business model is based upon providing extensive and specialized training and experience for, and sharing confidential business information with, its employees. Insight Global typically hires employees with no prior experience in or knowledge of the staffing industry in order to train them effectively to follow Insight Global's successful sales, marketing, and recruiting methods and strategies.  Insight Global devotes substantial amounts of time and expense to recruiting and training its employees and preparing them to advance with Insight Global and to succeed in building relationships with Insight Global's clients.

11.     Because of Insight Global's collaborative environment, its employees are exposed to and develop an intimate understanding of the staffing services business.  Insight Global's employees possess important knowledge regarding: (i) the key existing customer relationships associated with their office; (ii) Insight Global's sales strategy for developing and maintaining these business relationships; and (iii) the identities of the hiring managers and vendor managers who are Insight Global's primary customer contacts.  Sharing this information on a confidential basis among the sales manager, account managers, and recruiters who work together in each office is essential to Insight Global's business model.

12.     Beacon Hill is a direct competitor of Insight Global, also providing staffing services to clients throughout the country, including in the San Francisco metropolitan area.

13.     John Barker was employed by Insight Global from March 13, 2006 through and including October 26, 2016. Barker was first hired as a Recruiter, and thereafter worked as an Account Manager, Sales Manager, and Director of Operations in Insight Global's San Jose and San Francisco offices. In his final position as Director of Operations, Barker was the senior manager responsible for leading Insight Global's San Francisco Office of at least 65 employees.

14.     During the course of Barker's employment with Insight Global, Barker executed several versions of an employment agreement. The version of the Employment Agreement operative at the time of Barker's termination was executed on November 17, 2015. The Employment Agreement (Section 4) contains a provision entitled "AGREEMENT NOT TO SOLICIT EMPLOYEES," which states that, for one year following the termination of Barker's employment with Insight Global, Barker:

> shall not directly or indirectly, or in concert with others, solicit or encourage any person who is an employee of, or contractor or consultant for, [Insight Global], to resign from or terminate such employment or consulting relationship with [Insight Global]. [Barker] further agrees that [Barker] shall not, during the [year following termination], directly or indirectly, or in concert with others, solicit or encourage any person who is, or within one year prior to the solicitation was, an employee of [Insight Global] providing staffing services for [Insight Global], to perform staffing services for any corporation, individual, enterprise, entity, or association that competes  with [Insight Global] in [Insight Global]'s Business (a "<u>Competing Staffing Business</u>").

15.     On or about October 26, 2016, Barker's employment was terminated by Insight Global for cause. Insight Global is informed and believes and on that basis alleges that Barker thereafter began working for Beacon Hill.

16.     Insight Global is informed and believes and on that basis alleges that in or about December 2016 and January 2017, Beacon Hill, with full knowledge of Barker's employee non-solicit obligations, acted in concert with Barker and directed him to solicit and encourage many valuable Insight Global employees to quit their jobs at Insight Global and join Beacon Hill.  At the direction of and with full authorization from Beacon Hill, Barker directly and indirectly solicited and encouraged the following Insight Global employees to terminate their Insight Global

employment and join Beacon Hill: John McArthur, Connor Cronin, Bryan Verduzco, Candice Sanchez, Tim Silva, Hermis Alvarenga, Austin March, and Amanda Pizzimenti.  Insight Global is informed and believes and thereon alleges that Barker directly and indirectly solicited and encouraged additional Insight Global employees to join Beacon Hill as well.  These actions by Barker violated his non-recruitment obligations pursuant to the Employment Agreement.

17.     As a result of Barker's actions, which were done at the direction of and with full authorization from Beacon Hill, John McArthur, Connor Cronin and Bryan Verduzco all resigned from Insight Global and immediately began working with Barker at Beacon Hill.

18.     Barker used Insight Global's confidential information and trade secrets to recruit and hire away Insight Global employees.  Barker was not authorized by Insight Global to do so.

19.     John McArthur was employed by Insight Global as an Account Manager based in Insight Global's San Francisco office. McArthur worked for and reported directly to Barker.

20.     Insight Global provided McArthur with substantial and specialized training regarding its business model and sales and recruiting methods and strategies. Account Managers are responsible for creating business partnerships between Insight Global and companies in their given territory.  As an Account Manager in the San Francisco area, McArthur's primary responsibility was to represent Insight Global's staffing services as a resource to hiring and vendor managers at companies within the area and, in doing so, build and maintain valuable client relationships.  To promote profitable client relationships and goodwill, Insight Global encouraged McArthur to engage in significant client interaction and entertaining.  McArthur, on behalf of Insight Global, regularly attended meetings, lunches and other outings with Insight Global clients and prospective clients which Insight Global paid for.  As a result, McArthur developed business relationships with hiring and vendor managers in and around the San Francisco area at major companies.  In his position as Account Manager, and through his relationships with Insight Global's clients, McArthur was exposed to significant confidential information including but not limited to actual and potential customer information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates.

21. During the period McArthur was employed with Insight Global, he traveled to Atlanta, Georgia on at least two occasions to participate in special training at the Insight Global Headquarters, and to attend Insight Global's sales conferences held in downtown Atlanta. These trips were paid for entirely by Insight Global.

22. During 2016, in his position as an Account Manager, McArthur was responsible for generating in excess of $1.2 million in revenue for Insight Global.

23. McArthur abruptly resigned his employment with Insight Global on or about December 21, 2016.

24. Beacon Hill, acting through and in concert with Barker, solicited and encouraged McArthur to resign from Insight Global and join Beacon Hill.

25. Connor Cronin was employed by Insight Global as a Professional Recruiter based in Insight Global's San Francisco office. Cronin worked for and reported indirectly to Barker, and interacted with him on a frequent basis.

26. As a Professional Recruiter, Cronin was in regular communication with Insight Global's customers and clients.  His responsibilities included communicating with client hiring managers and vendor managers about their staffing needs, identifying and recommending the most qualified candidates, accompanying candidates to their interviews with human resources and management personnel at Insight Global's customers' offices, accompanying new placements on the first day of employment in their new positions, and then regularly interfacing between the customer and the consultants to ensure a mutually satisfactory work experience.  He also often accompanied Insight Global's account managers on lunches and other client outings.  As a result, Cronin developed significant contacts with Insight Global's key clients.

27. During the period Cronin was employed with Insight Global, he traveled to Atlanta, Georgia on at least two occasions to participate in special training at the Insight Global Headquarters, and to attend Insight Global's sales conferences held in downtown Atlanta. These trips were paid for entirely by Insight Global.

28. During 2016, in his position as a Professional Recruiter, Cronin was responsible for generating in excess of $5.4 million in revenue for Insight Global.

29.     Cronin abruptly resigned his employment with Insight Global on or about December 23, 2016.

30.     Beacon Hill, acting through and in concert with Barker, solicited and encouraged Cronin to resign from Insight Global and join Beacon Hill.

31.     Bryan Verduzco was employed by Insight Global as a Sales Manager based in Insight Global's San Francisco office, and had previously worked as an Account Manager with direct client relationships. Verduzco worked for and reported directly to Barker.  As a Sales Manager, Verduzco was responsible for overseeing a team of Account Managers and Recruiters in Insight Global's San Francisco office, including managing and being directly involved in the service of all existing client accounts and the development of new business. He was responsible for meeting with clients and prospective clients serviced from the San Francisco office, interviewing, hiring and managing new Recruiters and overseeing their development and promotion to Account Manager or Professional Recruiter, overseeing the solicitation of existing clients and prospective clients for new business, and overseeing the staffing of all requisitions received by the office.  In this role, Verduzco acted as the full-time, on-the-ground leader of the San Francisco office, reporting to a regional manager based in Atlanta, Georgia.  He would review reports prepared by each Account Manager to measure their production and sales leads, and participate on weekly leadership calls with other sales managers from his region and Insight Global senior leadership.

32.     During the period Verduzco was employed with Insight Global, he traveled to Atlanta, Georgia on several occasions to participate in special training at the Insight Global Headquarters, and to attend Insight Global's sales conferences held in downtown Atlanta. These trips were paid for entirely by Insight Global.

33.     Verduzco abruptly resigned his employment with Insight Global on or about January 11, 2017.

34.     Insight Global is informed and believes and on that basis alleges that, following Barker's termination, Beacon Hill, acting through and in concert with Barker, solicited and encouraged Verduzco to resign from Insight Global and join Beacon Hill.

35.     During 2016, in his position as a Sales Manager, Verduzco was responsible for overseeing several millions of dollars in client revenue for Insight Global.

36.     Insight Global has a legitimate and protectable interest in maintaining a stable employee base and protecting its confidential business information and trade secrets.

37.     Insight Global has made and continues to make substantial investments of personnel and financial resources to recruit, train, develop, and compensate its employees. These investments include providing Account Managers, Professional Recruiters, and Sales Managers with training in Atlanta, Georgia, as well as other on-the-job training.

38.     If Beacon Hill is permitted to continue to act in concert with Barker and lure away Insight Global employees in violation of Barker's Employment Agreement, and in violation of Insight Global's right to protect its confidential business information and trade secrets from misappropriation, Insight Global's workforce will be gutted, understaffed, and unstable.

39.     In order to replenish Insight Global's workforce, Insight Global will have to make enormous investments in time, money, training, and effort to recruit and develop new employees.

40.     Some or all of the employees hired by Beacon Hill are in possession of confidential business information owned by Insight Global.

41.     All of those employees are bound by valid and enforceable agreements that, among other things, (i) prevent them from using, disclosing, or exploiting Insight Global's confidential business information, (ii) require them to return all information and materials to Insight Global immediately upon termination of their employment.  Beacon Hill is aware that the employees are bound by these contractual obligations.

42.     Beacon Hill has instructed the former Insight Global employees that they do not need to comply with their contractual obligations.

43.     During his solicitation and recruitment of Insight Global employees, Barker has told them that Beacon Hill has an "army of lawyers" that it will pay to defend them against any legal action brought by Insight Global to enforce its contracts and protect its rights.  Insight Global is informed and believes and thereon alleges that Beacon Hill induced Barker and the other former employees to join Beacon Hill and breach their legal obligations to Insight Global by

indemnifying them against any future lawsuits and agreeing to pay the cost of any attorneys' fees they incur in litigation with Insight Global.

44. Insight Global has not authorized its former employees to possess, use, disclose, or exploit its confidential business information during their Beacon Hill employment or at any other time.

45. Barker and other former Insight Global employees have used Insight Global's confidential business information to conduct business for Beacon Hill and to solicit employees or clients to do business with Beacon Hill. Insight Global is informed and believes and thereon alleges that Beacon Hill has had knowledge of, and approved, these unlawful actions.

46. Barker has used his knowledge of non-public salary and compensation information to solicit, recruit, and encourage former Insight Global employees to quit their jobs and join him at Beacon Hill. Insight Global is informed and believes and thereon alleges that Barker has provided non-public salary and compensation information about other Insight Global employees to Beacon Hill and has acted in concert with Beacon Hill as its representatives have used that information in its efforts to poach employees away from Insight Global.

47. One or more of the employees hired away from Insight Global by Beacon Hill accessed Insight Global's secure computer systems to steal non-public business information from the company's databases in anticipation of competing against Insight Global on behalf of Beacon Hill.

48. Beacon Hill, through its new employees, has solicited business from at least one Insight Global client by using confidential Insight Global business information. In at least one instance, Beacon Hill has interfered with an "exclusive" agreement between Insight Global and a client to place a candidate in a position.

49. Insight Global is informed and believes and thereon alleges that some of the confidential business information that has been misappropriated by Beacon Hill, through its employees, meets the definition of a "trade secret" under applicable state and federal law. Insight Global is informed and further believes and thereon alleges that some of the confidential business

information that has been misappropriated by Beacon Hill, through its employees, does not meet the statutory "trade secrets" definitions.

50.     During his solicitation and recruitment of Insight Global employees, Barker has taken steps in an effort to keep his illegal activities hidden from disclosure.  Barker has told employees he was attempting to poach from Insight Global that they should avoid using text messages or other written communications, and should avoid making certain phone calls or conducting certain computer searches within the Insight Global office or using Insight Global IT resources.  Insight Global is informed and believes and thereon alleges that Barker has done these things at the instruction of and in concert with Beacon Hill in order to cover up the illegal nature of Beacon Hill's activities.

51.     McArthur, Cronin, and Verduzco were responsible, in the last year alone, for generating a combined total of more than $6 million in revenue for Insight Global. Their respective significant relationships with Insight Global's key clients, the source for that large amount of revenue, have now been lost, pilfered by Beacon Hill and Barker.

## FIRST CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations)

52.     Insight Global incorporates by reference and re-alleges, as though fully set forth herein, the allegations in paragraphs 1 through 51.

53.     Insight Global had ongoing and enforceable contractual relationships with McArthur, Cronin, and Verduzco, respectively, pursuant to which McArthur, Cronin, and Verduzco provided services to Insight Global.

54.     Each of McArthur's, Cronin's, and Verduzco's contractual relationships with Insight Global benefited Insight Global economically and likely would have continued to benefit Insight Global into the future.

55.     With full awareness of Barker's employee non-solicitation and non-disclosure obligations, and McArthur's, Cronin's, and Verduzco's ongoing contractual relationships with Insight Global, Beacon Hill engaged in wrongful conduct by acting in concert with Barker and inducing him to breach his employee non-solicitation obligations by soliciting, encouraging and

inducing McArthur, Cronin, and Verduzco to terminate their respective employment relationships with Insight Global and to accept employment with Beacon Hill in order to perform services in direct competition with Insight Global, and inducing him to breach his non-disclosure obligations by using and disclosing confidential Insight Global business information that Beacon Hill used to poach employees.

56.     In acting in concert with Barker in inducing and encouraging McArthur, Cronin, and Verduzco to terminate their employment with Insight Global in violation of Barker's non-solicitation obligations, through the use of confidential Insight Global business information, Beacon Hill intended to, and did, inflict damage upon Insight Global's business operations and reputation and Insight Global's business and contractual relationships with McArthur, Cronin, and Verduzco.

57.     Beacon Hill performed the foregoing wrongful acts, conduct, and omissions intentionally, fraudulently, maliciously, and oppressively in willful and conscious disregard of Insight Global's rights and with the intent and design to damage Insight Global. By reason thereof, Insight Global is entitled to recover punitive damages from Beacon Hill in an amount to be determined at the time of trial.

58.     Insight Global has no adequate remedy at law to compensate it for the damage caused, and that will continue to be caused, by Beacon Hill's intentional interference with Insight Global's contractual relationships. Unless Beacon Hill is restrained by appropriate injunctive relief, Insight Global will continue to suffer irreparable harm, including but not limited to damage to its business reputation and business opportunities, while Beacon Hill is unjustly enriched from its tortious conduct. Insight Global is therefore entitled to a preliminary and permanent injunction against Beacon Hill, prohibiting Beacon Hill from acting in concert with any former Insight Global employees bound by non-solicit obligations to solicit any Insight Global employees.

## SECOND CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

59.     Insight Global incorporates by reference and re-alleges, as though fully set forth herein, the allegations in paragraphs 1 through 51.

60.     Insight Global had, and has, economic relationships with numerous clients to provide a range of staffing services to those clients. A significant number of these clients were serviced by and had developed valuable relationship with Insight Global by and through Barker, McArthur, Cronin, and Verduzco. These relationships resulted in an economic benefit to Insight Global and, in reasonable likelihood, would have continued to result in an economic benefit to Insight Global but for Beacon Hill's conduct alleged herein, including, but not limited to, Beacon Hill inducing Barker, McArthur, Cronin, and Verduzco to breach their contractual obligations to Insight Global, and Beacon Hill acting in concert with Barker to solicit and encourage McArthur, Cronin, and Verduzco to terminate their respective employment with Insight Global.

61.     Beacon Hill was aware of Insight Global's actual and prospective client relationships and Insight Global's economically beneficial employment relationships with McArthur, Cronin, and Verduzco, intended to disrupt those relationships and divert them to the Beacon Hill, and did in fact disrupt those relationships and divert them to Beacon Hill by acting in concert with Barker to solicit and encourage McArthur, Cronin, and Verduzco to terminate their respective employment with Insight Global, and encouraging Barker, McArthur, Cronin, and Verduzco to misuse confidential Insight Global business information and to solicit and/or assist in soliciting certain clients of Insight Global to terminate, alter, and/or refrain from entering into continuing client relationships with Insight Global.

62.     Insight Global, McArthur, Cronin, and Verduzco were engaged in employment relationships that benefitted Insight Global economically and likely would have continued to benefit Insight Global in the future.

63.     With full awareness of Barker's contractual non-solicitation and non-disclosure obligations, and McArthur's, Cronin's, and Verduzco's ongoing contractual relationships with Insight Global, Beacon Hill engaged in wrongful conduct by acting in concert with Barker and inducing him to breach his non-solicitation and non-disclosure obligations by soliciting, encouraging and inducing McArthur, Cronin, and Verduzco to terminate their respective employment relationships with Insight Global and to accept employment with Beacon Hill in order to perform services in direct competition with Insight Global.

64.     In doing the foregoing, Beacon Hill intended to and did in fact disrupt Insight Global's business operations and contractual relationships with McArthur, Cronin, and Verduzco (and, Insight Global is informed and believes and thereon alleges, with Insight Global's clients) to the detriment of Insight Global and for the benefit of the Beacon Hill.

65.     Beacon Hill performed the foregoing wrongful acts, conduct, and omissions intentionally, fraudulently, maliciously, and oppressively in willful and conscious disregard of Insight Global's rights and with the intent and design to damage Insight Global. By reason thereof, Insight Global is entitled to recover punitive damages in an amount to be determined at the time of trial.

66.     As a direct and proximate result of Beacon Hill's unlawful conduct and intentional interference with Insight Global's prospective economic advantage, Insight Global has been and will continue to be damaged, including but not limited to lost revenue and lost business opportunities, and Beacon Hill has been and will continue to be unjustly enriched, all in amounts according to proof but in excess of $6,000,000.

67.     Insight Global has no adequate remedy at law to compensate it for the damage caused, and that will continue to be caused, by Beacon Hill's intentional interference with Insight Global's economic relationships. Unless Beacon Hill is restrained by appropriate injunctive relief, Insight Global will continue to suffer irreparable harm, including but not limited to damage to its business reputation and business opportunities, while Beacon Hill is unjustly enriched from its tortious conduct. Insight Global is therefore entitled to a preliminary and permanent injunction against Beacon Hill, prohibiting Beacon Hill from soliciting or providing services to any clients who were serviced by McArthur, Cronin, or Verduzco while they were employed by Insight Global.

**THIRD CLAIM FOR RELIEF**

(**Inducing Breach of Contract**)

68.     Insight Global incorporates by reference and re-alleges, as though fully set forth herein, the allegations in paragraphs 1 through 51.

69.     Under the Employment Agreement, Insight Global had an ongoing and enforceable contractual relationship with Barker, pursuant to which Barker agreed, for a period of one year after the voluntary or involuntary termination of his employment, not to directly or indirectly, or in concert with others, solicit or encourage any employee of Insight Global to resign from or terminate employment with Insight Global and not to use, disclose, or exploit any confidential Insight Global business information.

70.     The Employment Agreement, including the employee non-solicitation provision and the non-disclosure provision, benefited Insight Global economically and likely would have continued to benefit Insight Global into the future.

71.     Beacon Hill knew of the Employment Agreement when it had discussions with Barker about working for Beacon Hill, intended to induce Barker to breach the Employment Agreement with Insight Global, and did in fact induce Barker to breach the Employment Agreement by acting in concert with Beacon Hill to solicit and encourage several Insight Global employees to abruptly terminate their contractual relationship with Insight Global.

72.     In inducing and encouraging Barker to breach the non-solicitation provision and the non-disclosure provision of the Employment Agreement, Beacon Hill intended to, and did, inflict damage upon Insight Global's business operations and reputation and Insight Global's business and contractual relationships with McArthur, Cronin, and Verduzco, and others, including, but not limited to, clients to whom McArthur, Cronin, and Verduzco were providing services as employees of Insight Global and which are now being served by McArthur, Cronin, and Verduzco as employees of Beacon Hill.

73.     Beacon Hill performed the foregoing wrongful acts, conduct, and omissions intentionally, fraudulently, maliciously, and oppressively in willful and conscious disregard of Insight Global's rights and with the intent and design to damage Insight Global. By reason thereof, Insight Global is entitled to recover punitive damages in an amount to be determined at the time of trial.

74.     As a direct and proximate result of Beacon Hill's unlawful conduct and intentional interference with Insight Global's prospective economic advantage, Insight Global has been and

will continue to be damaged, including but not limited to lost revenue and lost business opportunities, and Beacon Hill has been and will continue to be unjustly enriched, all in amounts according to proof but in excess of $6,000,000.

75.     Insight Global has no adequate remedy at law to compensate it for the damage caused, and that will continue to be caused, by Beacon Hill's tortious conduct. Unless Beacon Hill is restrained by appropriate injunctive relief, Insight Global will continue to suffer irreparable harm, including but not limited to damage to its business reputation and business opportunities, while Beacon Hill is unjustly enriched from its tortious conduct. Insight Global is therefore entitled to a preliminary and permanent injunction against Beacon Hill, prohibiting Beacon Hill from soliciting or providing services to any clients who were serviced by McArthur, Cronin, or Verduzco while they were employed by Insight Global.

## FOURTH CLAIM FOR RELIEF

### (**Violations of Business and Professions Code Section 17200**)

76.     Insight Global incorporates by reference and re-alleges, as though fully set forth herein, the allegations in paragraphs 1 through 75.

77.     The acts and practices of Beacon Hill alleged herein, including, but not limited to, Beacon Hill's tortious interference with Insight Global's contractual relationships and prospective economic advantage and its possession and misuse of confidential Insight Global business information, constitute unfair, unlawful, and/or fraudulent business acts and practices under California Business and Professions Code Section 17200 because they are forbidden by various state and/or federal laws, and are unscrupulous, unfair, and injurious to Insight Global.

78.     Insight Global is informed and believes, and on that basis alleges, that Beacon Hill was aware of the wrongful nature of the acts alleged herein when said acts were committed.

79.     The unlawful and unfair business practices of Beacon Hill, as described above, present a continuing threat to Insight Global, which, in the absence of equitable or injunctive relief, will continue to suffer from the diversion of profits, clients, business opportunities, and/or other Insight Global employees, and continued damage to its business reputation.

80.     As a direct and proximate result of the aforementioned acts, Insight Global has suffered injury in fact, including, but not limited to, loss of revenue and other general and specific damages, including, but not limited to, damage to business reputation, lost profits, lost revenue and lost business opportunities, among other damages, all in amount to be determined according to proof at the time of trial.

81.     As a direct and proximate result of Beacon Hill's unlawful and unfair competition, Beacon Hill has been, and will continue to be, unjustly enriched by, among other ways, obtaining profits that would have otherwise been earned by Insight Global, all in amounts according to proof but in excess of the minimum jurisdiction of this Court.

82.     Unless Beacon Hill is restrained by appropriate injunctive relief, Insight Global will continue to suffer irreparable harm, including but not limited to damage to its business reputation and business opportunities, while Beacon Hill is unjustly enriched from its tortious conduct. Insight Global is therefore entitled to a preliminary and permanent injunction against Beacon Hill, prohibiting Beacon Hill from soliciting or providing services to any clients who were serviced by McArthur, Cronin, or Verduzco while they were employed by Insight Global.

## FIFTH CLAIM FOR RELIEF

### (**Trade Secrets Misappropriation under the federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act**)

83.     Insight Global incorporates by reference and re-alleges, as though fully set forth herein, the allegations in paragraphs 1 through 51.

84.     During their Insight Global employment, Barker, McArthur, Cronin, and Verduzco had access to, and obtained, confidential Insight Global business information.

85.     Insight Global's San Francisco office is an open environment, meaning the office's sales manager, account managers, and recruiters work together in a single open room referred to as the sales floor or the "pit."  To encourage open communication and exchange of information about sales leads, each account manager displays on a white board a list of leading sales prospects and staffing opportunities (referred to as "requisitions").  On any given day, requisitions posted usually include some staffing opportunities which are open to multiple staffing agencies and some staffing

opportunities to be filled exclusively by Insight Global.  The requisitions are then displayed in the pit, and the entire sales team, including the sales manager, account managers, and recruiters, meet regularly to discuss the sales prospects, goals, and strategies of each team member for that day. These meetings are referred to as Priority Zone, or "P-Zone."  While this information is made available to authorized Insight Global employees, it is treated as highly confidential information and is not made available to persons outside the company.

86.     Insight Global maintains other confidential records and reports regarding its business relationships with customers and vendors.  Insight Global's employees create and update "client sheets" for each customer.  Together, client sheets comprise an account book.  Account books contain confidential information concerning Insight Global's actual and prospective customers, including detailed information regarding the customer's IT systems, short and long term staffing needs, staffing preferences, and chain of command for hiring decisions. The account book also contains contact information for customers' and clients' hiring managers and vendor managers (including non-public information such as personal mobile phone numbers) and other personal information relating to such hiring managers.  The information collected in the account books is not publicly available and/or is only learned after significant efforts by the Insight Global employees to develop relationships with such personnel.  The information contained in the account books is a central part of Insight Global's successful sales strategy to build lasting personal and professional relationships with its customers' hiring managers and vendor managers. Account books are maintained online through Insight Global's proprietary IT system with tiered user access to ensure that the information contained in the account books is available only to appropriate personnel that are current employees of Insight Global with a need to access such information.  No persons outside the company are allowed to receive copies.

87.     Insight Global's employees maintain and update confidential spreadsheets called call sheets on a daily basis.  These call sheets contain sales leads and contact information.  Insight Global employees use these call sheets to generate their daily sales calls.  Each workday, call sheets are saved to the Insight Global network, the underlying information provided to their

manager, and a paper copy filed in employee's work space.  No persons outside the company are allowed to receive copies.

88.     Additionally, every employee in an office prepares and submits a confidential weekly sales report which is electronically circulated to employees in such employee's office. These reports contain valuable and confidential recruiting and sales information including details of key requisitions, client preferences, out of office client opportunities, pricing and billing schemes, and information about top performing employees at the Company.  No persons outside the company are allowed to receive copies.

89.     Management employees at Insight Global have access to non-public financial and business information about Insight Global and its employees and clients.  While this information is made available to authorized Insight Global employees, it is treated as highly confidential information and is not made available to persons outside the company.

90.     Barker, McArthur, Cronin, and Verduzco retained and misappropriated Insight Global's trade secrets, have disclosed those trade secrets to other Beacon Hill representatives, and/or have used those trade secrets to compete against Insight Global.  The trade secrets at issue in this case include but are not limited to detailed customer lists in the form of non-public reports and/or that contain non-public information housed within Insight Global account books.

91.     Insight Global has not given Beacon Hill its express or implied consent to possess or use its trade secrets.

92.     Insight Global has taken reasonable efforts to maintain the secrecy of its trade secrets.

93.     Insight Global derives independent economic value from the secret nature of its trade secrets and due to the fact that they are not generally known to the public or to competitors such as Beacon Hill.

94.     Beacon Hill, though the employees it has hired from Insight Global, is now in possession of Insight Global's trade secrets and is using those to conduct business and compete against Insight Global.  Those trade secrets include, but are not limited to, client information taken

from Insight Global's account books database.  Beacon Hill is using those trade secrets to solicit clients and employees away from Insight Global.

95.     Beacon Hill used improper means to acquire Insight Global's trade secrets or knew or had reason to know that the trade secrets were acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.

96.     As a direct and proximate result of Beacon Hill's trade secrets misappropriation, Insight Global has been and will continue to be damaged, including but not limited to lost revenue and lost business opportunities, and Beacon Hill has been and will continue to be unjustly enriched.

97.     Beacon Hill has misappropriated Insight Global's trade secrets willfully and maliciously.  By reason thereof, Insight Global is entitled to recover exemplary damages and is entitled to recover the attorneys' fees it reasonably incurred to prosecute this action.

98.     Unless Beacon Hill is restrained by appropriate injunctive relief, Insight Global will continue to suffer irreparable harm through the actual and threatened misappropriation of its trade secrets.  Insight Global is therefore entitled to a preliminary and permanent injunction against Beacon Hill, prohibiting Beacon Hill from possessing, using, disclosing, or otherwise misappropriating its trade secrets.

## **PRAYER FOR RELIEF**

WHEREFORE, Insight Global prays that a judgment be entered by the Court as follows:

1.     For an award of compensatory and general damages against Beacon Hill according to proof;

2.     For an award of special damages against Beacon Hill according to proof;

3.     For an award of consequential damages against Beacon Hill, according to proof but in excess of $6,000,000.00.

4.     For a preliminary and permanent injunction against Beacon Hill prohibiting Beacon Hill, and those acting in concert with it, from soliciting or providing services to any clients who were serviced by Barker, McArthur, Cronin, or Verduzco while they were employed by

Insight Global, or from acting in concert with any former Insight Global employees bound by employee non-solicit obligations to solicit or encourage any other Insight Global employees to terminate their employment with Insight Global, or from acting in concert with any former Insight Global employees bound by non-disclosure obligations to use or disclose confidential business information.

5.    For an award of prejudgment interest against Beacon Hill at the maximum legal rate;

6.    For an award of punitive and exemplary damages against Beacon Hill according to proof;

7.    For an award of costs and disbursements incurred herein;

8.    For an award of damages for unjust enrichment or, alternatively, for a reasonably royalty for Beacon Hill's unauthorized disclosure or use of Insight Global's trade secrets;

9.    For an award of attorneys' fees under applicable statutory law; and

10.    For such other and further relief as the Court may deem just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Insight Global hereby demands a jury trial on all claims asserted herein.

Dated:  January 20, 2017

PROSKAUER ROSE LLP
Anthony J. Oncidi
Jeremy M. Mittman
Pietro A. Deserio

By: _____ */s/ Jeremy M. Mittman*
          Jeremy M. Mittman

**Attorneys for Plaintiff,
INSIGHT GLOBAL, LLC**